UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DIANE DOOLEY, ) | CASE NO. 1:10CV544 |
| ) | |
| Plaintiff, ) | MAGISTRATE JUDGE GEORGE J. |
| v. ) | LIMBERT |
| ) | |
| MICHAEL J. ASTRUE, ) | MEMORANDUM OPINION |
| COMMISSIONER OF ) | AND ORDER |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Diane Dooley ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the Court REVERSES the Commissioner's decision and REMANDS the instant case for further factfinding, analysis, and articulation by the administrative law judge ("ALJ"):

I. **PROCEDURAL AND FACTUAL HISTORY**

On August 15, 2006, Plaintiff filed an application for DIB, alleging disability beginning August 1, 2004. ECF Dkt. #11-6 at 133-137.[1] The SSA denied Plaintiff's application initially, ECF Dkt. #11-5 at 114-116, and on reconsideration. *Id.* at 118-120. On March 6, 2007, Plaintiff filed a request for an administrative hearing. *Id.* at 123. On April 9, 2009, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel. ECF Dkt. #11-3 at 71-109. At the hearing, the ALJ heard testimony from Plaintiff and Kevin Yi, a vocational expert ("VE"). *Id.* On September 15, 2009, the ALJ issued a Decision ("Decision") denying benefits. ECF Dkt. #11-2 at 50-57. Plaintiff filed a request for review, ECF Dkt. #11-2 at 45-46, which the Appeals Council denied. *Id.* at 42-44.

---

[1]Page numbers refer to "Page ID" numbers in the electronic filing system.

On March 12, 2010, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On August 12, 2010, Plaintiff filed a brief on the merits. ECF Dkt. #13. On October 12, 2010, Defendant filed a brief on the merits. ECF Dkt. #15. No reply brief was filed.

## II. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from thoracolumbar scoliosis, opoid [sic]/narcotic dependence and abuse (specifically Vicodin), in recent reported remission, and degenerative disc disease of the lumbar spine, which qualified as severe impairments under 20 C.F.R. §404.1520(c). ECF Dkt. #11-2 at 52. Although there was evidence in the record that Plaintiff suffered a tear in her right medial meniscus and that she underwent surgery to repair it, and that she suffered from depression, the ALJ concluded that those limitations constituted non-severe impairments. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *Id.* at 53. She ultimately concluded that Plaintiff has the residual functional capacity to perform the full range of light work, as defined by 20 C.F.R. §404.1567(b). *Id.*

## III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age,

> education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, __ F.3d __, 2011WL 274792, *3, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V. ANALYSIS

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the ALJ erred when she did not classify Plaintiff's depression as a severe impairment. Next, Plaintiff argues that the ALJ's conclusion that she failed to follow prescribed treatment is not supported by substantial

evidence. Finally, Plaintiff asserts that the ALJ erred in concluding that Plaintiff is capable of performing a full range of light work.

The medical records of Plaintiff's treating physician, Dr. David Ludwig, establish that Plaintiff was diagnosed with scoliosis of the spine when she was eighteen years old, although she was not experiencing any pain at that time and she did not receive any treatment. ECF Dkt. #11-14, p. 344. As the years passed, Plaintiff began experiencing increasing pain but initially managed it with Motrin, Anaprox, and Flexeril. ECF Dkt. #11-13, p. 277-300. In 2001, Plaintiff was prescribed Vicodin for back pain. ECF Dkt. #11-13, p. 274.

Due to progressively worsening pain, Plaintiff saw Dr. Jerold P. Gurley in March 2003. Dr. Gurley recommended "Harrington rods and surgical options," however, Dr. Ludwig's records reflect that Plaintiff was "not yet ready to accept" surgery "& would like to have pain management evaluate & see if there are other options." ECF Dkt. #11-12, p. 267. Notes from March of 2004 indicate that Plaintiff's low back was improving as a result of nerve block treatments from "Dr. Choi." *Id.* at 264. In January of 2005, Plaintiff's back pain was exacerbated when she shoveled snow. *Id.* at 261. Plaintiff explained at the hearing that there was a snow storm that day, her husband was at work for 16 hours, and she had to shovel snow in order to make a pathway for the mailman and to allow her dog to get out of the house. ECF Dkt.#107.

Pain management became an issue in April of 2005, when Plaintiff sought inpatient detoxification due to an addiction to Vicodin. ECF Dkt. #11-12, p. 259, #11-15, p. 349. According to hospital records, Plaintiff was prescribed Vicodin for back pain "three years ago" and, at some point, began taking more than the prescribed strength. At the time she was admitted for inpatient care at Southwest General Health Center, Plaintiff admitted to having prescriptions from several orthopaedic physicians and also acquiring additional medication from friends. Plaintiff was depressed and suicidal. Plaintiff was released three days later, with prescriptions for Neurontin and Lexapro. *Id.* at 351. At a follow up appointment with Dr. Ludwig on April 18, 2005, Plaintiff indicated that the Neurontin "completely resol[ved]" her back pain and that she did not take the Lexapro because "Her symptoms were minimal." ECF Dkt. #11-12, p. 259. She further reported that she was comfortable with walking and moving. *Id.*

-4-

On June 1, 2006, at an appointment for an unrelated medical problem, Plaintiff reported that her back pain had returned and that she was seeing a chiropractor with experiencing limited results. *Id.* at 256. Dr. Ludwig arranged for physical therapy. Dr. Ludwig's October 26, 2006 notes read, in pertinent part:

> Chronic back pain. She has been seen by a total of five surgeons, all of which recommend spinal fusion, rods, & she thinks she'll go with Dr. Collis. She is very upset & concerned about her upcoming surgery. Has become more depressed, emotional, crying, unable to focus & concentrate & feeling down. We discussed treatment options revolving around counseling as well as medication & will start Cymbalta. . .She would like to apply for disability & will forward records to SSI, I do believe at this point she is fully disabled due to her back problems.

ECF. Dkt. #254.

On September 12, 2006, Plaintiff was examined by an orthopaedic surgeon, Dr. Michael Eppig. ECF Dkt. #11-14, p. 345. He explained that to her that minimal operations for disc or stenosis were unlikely to give her any lasting relief. He indicated that she now had more progressively limiting pain in her back, and that the condition was likely to worsen. He cautioned her that surgical intervention would require her to be in the best possible health, and he instructed her to stop smoking.[2] He recommended a stationary bicycle or aquatic therapy. He informed her that her recovery period would be at least a full year or longer.

Dr. Jerry McCloud prepared a physical residual functional assessment on November 28, 2006. Dr. McCloud concluded that Plaintiff could occasionally lift twenty pounds, and frequently lift ten pounds, and that she could stand or walk (with normal breaks) or sit for about six hours of an eight hour work day. Dr. McCloud further concluded that Plaintiff could frequently climb stairs, occasionally balance, stoop, kneel, and crouch, but could never climb ladders or crawl. ECF Dkt. 11-14, p. 325. Dr. McCloud did not review Dr. Ludwig's assessment of Plaintiff's physical capabilities because Dr. Ludwig's medical records were not available. Id. at 329.

At a December 5, 2006 appointment, Plaintiff reported that her pain level was ten out of ten and that she was seriously considering surgery, but had not started Cymbalta. ECF Dkt. #11-17, p. 388. Dr. Ludwig consistently encouraged Plaintiff to take Cymbalta. On January 31, 2007,

---

[2]Plaintiff had not stopped smoking as of the date of the hearing. ECF Dkt. #11-3, p. 93.

Plaintiff's pain level was nine out of ten and she was taking four Vicodin per day. Surgery was scheduled for February 14, 2007, but she still had not started taking Cymbalta. ECF Dkt. #11-16, p. 386.

Dr. Ludwig's notes from March 27, 2007 indicate that Plaintiff had discarded her Vicodin out of fear that her addiction problem was resurfacing. *Id.* at 385. She did not have surgery in February, opting instead for chiropractic treatment. At some point, she started Cymbalta then stopped taking it because it was not helping. Dr. Ludwig encouraged her to start the medication again. She was prescribed Neurontin and Celebrex for pain. Dr. Ludwig noted that Plaintiff "probably will not be employable due to recurrent & chronic back pain, which rates anywhere from 10 out of 10 down to about 6 out of 10." *Id.*

On June 6, 2007, Plaintiff reported getting some relief from chiropractic visits and IDD therapy, but that her insurance was running out. *Id.* at 383. Plaintiff did not start Neurontin due to concerns about vision changes she experienced when she had taken it previously. Dr. Ludwig recommended resuming physical therapy and purchasing a home TENS unit, as electric stimulation at the chiropractor's office had helped her pain. Dr. Ludwig's July 2005 notes indicate that Plaintiff did not purchase a TENS unit and that she continued to refuse to take Cymbalta. He prescribed Lyrica for pain management. *Id.* at 382. Plaintiff's back pain continued through the end of 2007 during which she continued to decline surgery and to take Cymbalta. *Id.* at 378-381.

Although she was still resistant to surgery, Plaintiff agreed to try Cymbalta at her January 3, 2008 appointment with Dr. Ludwig. Id. at 377. She had discontinued Lyrica due to nausea. At her February 2008 appointment, Plaintiff expressed interest in a new surgical procedure to be performed by a "Dr. Moore." She still had not started taking Cymbalta, and Dr. Ludwig encouraged her to take it. *Id.* at 376. Dr. Ludwig referred Plaintiff to the Cleveland Clinic for non-surgical pain management. According to the medical notes for April 28, 2008, Plaintiff was unable to complete the pain management program because of the extensive traveling that it required. *Id.* at 375. At some point, Plaintiff had begun taking Cymbalta. Dr. Ludwig recommended daily physical activity, stretching and use of a TENS unit. On December 2, 2008, Plaintiff reported that she stopped taking Cymbalta due to nausea, and that she stopped physical therapy and epidural blocks.

Dr. Ludwig prescribed Celebrex and recommended limited use of Vicodin due to her previous addiction. *Id.* at 372. In early 2009, Dr. Ludwig prescribed Tramadol and Ultram for pain. *Id.* at p. 371.

Plaintiff was seen by Dr. Cyril Marshall on March 30, 2009, for a medical assessment of her ability to do work-related activities. Dr. Marshall noted that extensive surgery would be required to correct the scoliosis, and that there was no guarantee that her pain would be relieved post surgery. Dr. Marshall diagnosed severe, uncompensated thoraco-lumbar scoliosis with symptomatic pain and radicular symptoms. He concluded that she was unfit for employment. ECF Dkt. #11-17, p. 405. Dr. Marshall limited her ability to lift to one to two pounds occasionally, and her ability to stand and walk to 20-30 minutes in an eight hour day. He concluded that she could only sit for two hours of an eight hour day. *Id.* at 406. Dr. Marshall concluded that Plaintiff could neither sit nor stand and walk continuously without interruption. He predicated his findings on examination and medical review. *Id.* at 407.

Plaintiff first argues that the ALJ erred in concluding that Plaintiff's depression was not a severe impairment. Mental disorders are defined in terms of the functional limitations which are assessed in four areas: activities of daily living; social functioning concentration; persistence or pace; and deterioration or decompensation in work or work-like settings. 20 C.F.R. §404.1520a (1989). At step two, Plaintiff must show that she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a). The Regulations define basic work activities as being the " 'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. Appx. 181, 190 (6th Cir. Aug.27, 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

At step two, the term "significantly" is liberally construed in favor of the claimant. The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will

generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a " *de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two would be only harmless error. *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must also be considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §416.920(d).

Here, the ALJ considered Plaintiff's depression when she formulated Plaintiff's residual functional capacity. As a consequence, the ALJ's failure to classify Plaintiff's depression as a severe impairment constitutes harmless error. The ALJ ultimately concluded that Plaintiff's failure to take Cymbalta, even though it was originally prescribed for her in October of 2006, was evidence that Plaintiff's depression was not a disabling impairment.[3]

> 20 C.F.R. §404.1530, captioned, "Need to follow prescribed treatment," reads, in its entirety:
>
> (a) What treatment you must follow. In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.
>
> (b) When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.
>
> (c) Acceptable reasons for failure to follow prescribed treatment. We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment. The following are examples of a good reason for not following treatment:

---

[3]Plaintiff does not assert that her failure to take the prescribed medication was a byproduct of her mental illness.

-8-

>(1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
>(2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
>(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
>(4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
>(5) The treatment involves amputation of an extremity, or a major part of an extremity.

The record reflects that Plaintiff was prescribed Cymbalta as early as June 2006, but never took it as prescribed, despite the fact that Dr. Ludwig encouraged her to take the medication from the time it was originally prescribed until well into 2008. The ALJ's conclusion that Plaintiff was not disabled as a result of her failure to follow her prescribed treatment is further supported by the fact that, at the hearing, Plaintiff testified that she was currently taking Cymbalta and that it had helped her depression. ECF Dkt. #11-3, p. 104. Plaintiff explained that the medication made her nauseous and that is why she initially refused to take it. However, she began taking it at night and was later able to tolerate taking it during the day. *Id.* at 104-05. Accordingly, the ALJ did not err when he concluded that Plaintiff's depression was not a severe impairment at step two or that she was not disabled as a result of her depression.

Next, Plaintiff argues that the ALJ's conclusion that she failed to follow prescribed treatment is not supported by substantial evidence. The ALJ's decision to deny benefits was largely based on Plaintiff's refusal to undergo back surgery. In order to support a denial of benefits, the evidence must show that prescribed treatment would restore the claimant's ability to perform substantial gainful activity. See *Harris v. Heckler*, 756 F.2d 431, 435–436 (1985); *Fraley v. Sec'y of Health & Human Serv's.*, 733 F.2d 437, 440 (1984). Although there is evidence in the record that five orthopaedic physicians recommended surgery, the record is devoid of any evidence that the proposed surgery would restore Plaintiff's ability to work.

Dr. Eppig recommended surgery and noted that Plaintiff's condition would get worse rather than better without surgical intervention, and that less invasive surgical procedures would be futile. ECF Dkt. #11-14, p. 345. However, his notes do not indicate whether the surgery would necessarily result in any improvement in Plaintiff's ability to work. Likewise, the records of Dr. Gurley indicate that he recommended spinal fusion surgery, but read, "I discussed the risks, benefits, complications and potential clinical, medical, and surgical outcomes which I frankly stated including any conceivable risks, complications and outcome(s) recorded or unrecorded in the history of the mankind." *Id.* at 335. Moreover, Plaintiff was told that the surgery may not reduce her level of pain. At the hearing, Plaintiff testified that, although the surgery would "straighten her up," it may not "take away all the pain [she has]." ECF Dkt. #11-9, p. 88. She further testified that no physician would guarantee the alleviation of her pain, and that she was also cautioned that surgery could leave her "worse off." *Id.* at 88-90.

"It is not [Plaintiff's] burden to undergo any and all surgical procedures suggested by [her] physician lest [s]he is barred from receiving disability benefits." *Fraley*, supra, 733 F.2d at 440. Furthermore, where a claimant's treating physician considers the claimant's decision not to undergo prescribed treatment to be a reasonable decision, good cause exists for the failure to receive the treatment. See *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir.1978). There is no indication in the record that Plaintiff's treating physician considered her decision to forgo surgery to be an unreasonable one, as his records do note reflect any encouragement on his part regarding surgical intervention. Accordingly, Plaintiff correctly argues that the ALJ's reliance on her refusal to have back surgery was misplaced.

In her final argument, Plaintiff contends that the AJL erred in concluding that she is capable of performing light work. "Light work" involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there

>are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

In concluding that Plaintiff could perform light work, the ALJ found that Plaintiff's pain was not as severe as she claimed at the hearing. Plaintiff testified that she can sit, stand or walk for a couple of minutes, and she can only lift a few pounds. ECF Dkt. #11-3, p. 99. She further testified that the only way to alleviate her pain is to lay down. When asked how she could sit through the hearing, she stated that she was experiencing pain in her leg, hip and lower back, and that it was "killing [her]." *Id.* at 100. She attested that her pain was bearable, due you her use of Ultram, Flexeril, and Cymbalta. *Id.* at 101.

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 416.929. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

The ALJ found that there were medically determinable physical impairments that could reasonably be expected to produce Plaintiff's pain. However, when a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined

in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

The ALJ found that Plaintiff's medical condition could be expected to produce pain, but not the kind of severe pain that Plaintiff alleged. Although the ALJ relied in large part on Plaintiff's failure to undergo back surgery for her conclusion that Plaintiff was not disabled, she also rested that conclusion upon three factual incidents in the record. The ALJ wrote:

> [W]hile the claimant's scoliosis has worsened over the years and she does have a condition which would reasonably be expected to cause pain, the evidence in the record establishes that the claimant is not credible and that her pain is not of disabling severity. The evidence indicates that the claimant managed to work over the years in between exacerbations of her back pain. Also, it has been noted on one occasion that she had an exacerbation of pain after cutting her grass and raking and it was noted that she was shoveling snow as recently as January 2005. It should be noted that in April 2005, the claimant's doctor indicated that she was comfortable with walking and movement.

ECF Dkt. #11-2, p. 55.

The ALJ's reference to work that Plaintiff performed during a time that she was reporting debilitating pain to her doctors is based upon two statements in the record. First, when she was admitted for inpatient treatment for Vicodin addiction in April 2005, she reported that she was suffering from poor concentration that was affecting her job at the hospice and the restaurant. Second, when Plaintiff went to an emergency room complaining of chest pain on February 10, 2006, the records reflect that she was "gainfully employed and independent in her activities of daily living." ECF Dkt. #11-9, p. 219. Her admission form lists her occupation as a server at Fall Family Restaurant. *Id.* at 217.

-12-

At the hearing, Plaintiff claimed that her last job was at the deli at Buy Rite, but she could not provide a detailed list of jobs that she had performed previously and the years that she performed them. ECF Dkt. 11-3, p. 80-81. She conceded that she worked at a nursing home (hospice) but claimed that she worked at the nursing home (hospice) before she worked at Buy Rite. *Id.* With respect to an alleged job at Falls Family Restaurant in 2006, she testified that she was "going to work for them, but [she] didn't. *Id.* at 82. In a form completed for the purpose of her application for DIB, Plaintiff did not list any job later in time than her job as a deli clerk from 2002 to 2004. ECF Dkt. #11-7, p. 161. Plaintiff's statement that she was experiencing lower back pain as a result of "raking" was taken from a patient update form from her chiropractor's office on June 1, 2001. ECF Dkt. #11-10, p. 237. She explained at the hearing that she had shoveled snow in January 2005 out of necessity during a snow storm.

Although there appears to be conflicting evidence in the record that Plaintiff was employed in 2005 and 2006, the ALJ's Decision must nonetheless be reversed. In finding that Plaintiff did not suffer from disabling pain, the ALJ rejected Dr. Ludwig's assessment of Plaintiff's physical impairment, as well as Dr. Marshall's assessment, both of which concluded the Plaintiff was completely unable to work. She wrote that Dr. Ludwig's opinion that Plaintiff was fully disabled was not supported by objective medical evidence and did not take into account that Plaintiff consistently failed to follow prescribed treatment over the years. She rejected Dr. Marshall's opinion because he only examined Plaintiff on one occasion.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. The ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378

-13-

F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

Here, the ALJ rejected Dr. Ludwig's opinion that the Plaintiff could not work in any capacity by summarily stating that his opinion is not supported by objective medical evidence and does not take into consideration the fact that Plaintiff failed to follow prescribed treatment over the years. As stated previously, Plaintiff's decision to forego back surgery may not be considered as there is no evidence on the record that surgery will restore Plaintiff's ability to work. Moreover, Dr. Ludwig's conclusions about the degree of Plaintiff's impairment are supported by clinical and laboratory diagnostic techniques, as well as the opinions of several orthopaedic surgeons and Dr.

-14-

Marshall.  On remand, the Commissioner may reach the same conclusion as to Plaintiff's disability while complying with the treating physician rule and the good reasons requirement.  However, because the ALJ summarily concluded that there was no medical evidence in the record to support Dr. Ludwig's conclusions and relied, in error, upon Plaintiff's refusal to undergo back surgery, this matter must be remanded.

For the foregoing reasons, the undersigned REVERSES the Commissioner's decision and REMANDS the case for further factfinding, analysis, and articulation by the ALJ regarding the treating physician's rule and the good reasons requirement consistent with this opinion.


DATE: September 20, 2011                   */s/George J. Limbert*
                                            GEORGE J. LIMBERT
                                            UNITED STATES MAGISTRATE JUDGE